### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------ x
THE COUSTEAU SOCIETY, INC.,      :
                                 :
          Plaintiff,             :
                                 :
          v.                     :
                                 : Civil No. 3:19-cv-1106(AWT)
CELINE COUSTEAU; CAUSECENTRIC    :
PRODUCTIONS, INC.; and THE       :
CELINE COUSTEAU FILM FELLOWSHIP  :
INC. a/k/a THE OUTDOOR FILM      :
FELLOWSHIP,                      :
                                 :
          Defendants.            :
------------------------------ x
```

### <u>RULING ON MOTION TO DISMISS</u>

Plaintiff The Cousteau Society, Inc. ("TCS") brings this action against defendants Celine Cousteau, CauseCentric Productions, Inc. ("CPI"), and The Celine Cousteau Film Fellowship Inc. a/k/a The Outdoor Film Fellowship ("CCFF"), claiming Lanham Act trademark infringement and false association (Counts I, II, and III), violations of Connecticut common-law trademark and unfair competition law (Count IV), and violations of the right of publicity under French or Connecticut law (Counts V and VI). The defendants move to dismiss for lack of personal jurisdiction or, in the alternative, failure to state a claim. For the reasons set forth below, their motion is being granted in part and denied in part.

I.    **FACTUAL ALLEGATIONS**

Plaintiff TCS is a New York not-for-profit corporation with its principal place of business in Virginia.  It was established in 1973 to promote and protect the legacy of Jacques-Yves Cousteau, a French oceanic explorer, documentarian, and marine conservationist who died in 1997.  In the 1940s, Jacques-Yves Cousteau began filming underwater after co-developing the aqualung and underwater camera.  He explored and researched the world's oceans, seas, and rivers for nearly half a century aboard his ship, the Calypso.  He produced more than 120 television series and specials, documentaries, and films, and authored more than fifty books based on his explorations aboard the Calypso and other vessels.  He also led efforts at marine conservation and sought to raise awareness about the consequences of pollution and human behavior on the environment.

Prior to his death, Jacques-Yves Cousteau transferred the exclusive rights to his worldwide intellectual property portfolio to TCS.  The intellectual property portfolio includes registered and unregistered trademarks, as well as Jacques-Yves Cousteau's personality rights, such as his right of publicity. TCS has registered trademarks including "THE JOURNEY CONTINUES," "JACQUES-YVES COUSTEAU," "COUSTEAU," and "CALYPSO."  TCS also alleges that Jacques-Yves Cousteau's red cap has gained distinctiveness and notoriety and is entitled to trademark

protection, although it is not registered.  Additionally, TCS owns the exclusive rights to use Jacques-Yves Cousteau's name, image, signature, voice, photograph, and likeness.

Defendant Celine Cousteau is an estranged granddaughter of Jacques-Yves Cousteau.  CPI and CCFF are the same entity.  CPI simply changed its name in 2015.  Celine Cousteau is the founder and executive director, and a board member, of defendant CPI/CCFF, which produces and distributes multimedia content with an emphasis on short films concerning environmental and socio-cultural issues.[1]  Neither of the defendants is or has been associated with TCS.

Celine Cousteau produced, narrated, and appeared in a not-yet-released documentary entitled <u>Celine Cousteau, The Adventure Continues</u> (the "Documentary").  The Documentary "retraces [Jacques-Yves Cousteau's] steps, exploring how the planet has changed since his epic adventures."  (First Am. Compl. ("FAC"), Ex. L, at 2, ECF No. 24.)  The Documentary is being shot in multiple locations around the world, including Patagonia and the Red Sea.  (<u>See</u> <u>id.</u> at 2-3.)  TCS alleges that the Documentary and its related promotional materials infringe on TCS's intellectual property.  TCS alleges that the title of the

---

[1] For purposes of discussing a factual allegation in the First Amended Complaint the court uses the name used by the plaintiff for purposes of that factual allegation.

Documentary is confusingly similar to its mark THE JOURNEY
CONTINUES.  TCS also alleges that Celine Cousteau used images of
Jacques-Yves Cousteau, used the mark JACQUES-YVES COUSTEAU, and
traded off Jacques-Yves Cousteau's legacy to market and promote
the Documentary through a promotional teaser video, which was
uploaded to YouTube.  The defendants also use an image of
Jacques-Yves Cousteau wearing his trademarked red cap and the
mark JACQUES-YVES COUSTEAU in a press kit for the Documentary,
which they have distributed to TCS's business partners.  The
promotional materials for the Documentary note that "[i]n the
first few minutes [of the Documentary], Celine [Cousteau]
reminisces about her grandfather and his time in the region."
(FAC, Ex. K, at 10.)  Those materials also refer to Jacques-Yves
Cousteau's past work, stating:

> To gain a better understand of [the whale], Jacques-
> Yves Cousteau sailed to the southern seas to observe
> whales in their own kingdom.  That was back in 1972,
> the year Celine [Cousteau] was born. . . .  45 years
> later, Celine [Cousteau] takes off from Chiole, the
> gateway to Patagonia . . . .

(Id. at 14.)  They also state that Jacques-Yves Cousteau "took
[Celine Cousteau] on a trip to the Amazon when she was nine, on
board his research boat.  Her destiny to follow the legacy came
right away."  (FAC, Ex. L, at 3.)

Celine Cousteau also directed and co-wrote a film entitled
Tribes on the Edge (the "Film"), which was produced by CPI.  She

also appears in and narrates the Film.  The Film explores
environmental threats and health crises of indigenous peoples in
the Brazilian Amazon River Basin.  TCS alleges that the Film and
its related promotional materials infringe on TCS's intellectual
property.  The Film gratuitously uses images and pictures of
Jacques-Yves Cousteau and exploits his name.  In promoting the
Film on CPI's website, the defendants exploited Jacques-Yves
Cousteau's name and likeness in various posts.  On CPI's
website, a post about the Film by Celine Cousteau says: "Twenty-
five years after joining my grandfather and his Calypso crew on
his expedition in the Amazon, here I was again, this time with
my father . . ."  (FAC ¶ 93.)  Celine Cousteau also promoted the
Film on CPI's website by offering a giveaway of one of Jacques-
Yves Cousteau's books.  There is also a post on CPI's website
which contains the tag "jacques-yves cousteau" even though
Jacques-Yves Cousteau is not mentioned in the post.  In the
defendants' promotional teaser for the Film, Celine Cousteau
narrates and references Jacques-Yves Cousteau and her trip with
him to the Amazon, and "invokes Jacques-Yves Cousteau's likeness
by referring to him and superimposing a picture of herself in
front of the Calypso."  (Id. ¶ 96.)  The Film was promotionally
screened to a live crowd in Connecticut on July 19, 2019.

TCS also alleges that the defendants infringe on TCS's
intellectual property through various activities which are

designed to attract donors and funding for CCFF.  For example,
Celine Cousteau posted on CCFF's website: "I am excited to
announce, on my grandfather's birthday . . . the launch of The
Celine Cousteau Film Fellowship."  (Id. ¶ 100.)  Further, on
CCFF's website, "Celine Cousteau used to purposefully provide a
picture of what appear to be 'fellows' and 'mentors' in Jacques-
Yves Cousteau's trademarked red cap."  (Id. ¶ 101.)  In another
post, Celine Cousteau writes about her grandfather as the "great
inspiration for me personally as I set out to launch my own
organization," and she includes a photograph of Jacques-Yves
Cousteau hugging a young Celine Cousteau.  (Id. ¶ 102.)  TCS
alleges that the defendants use and trade off TCS's intellectual
property to create the false impression that Jacques-Yves
Cousteau is associated with or supports the defendants.

## II.  LEGAL STANDARDS

### A.  Personal Jurisdiction -- Federal Rule of Civil Procedure 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal
jurisdiction, "[t]he plaintiff bears the burden of establishing
that the court has jurisdiction over the defendant . . . ."
Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir.
2001).  Where a defendant challenges "only the sufficiency of
the plaintiff's factual allegation, in effect demurring by
filing a Rule 12(b)(2) motion, the plaintiff need persuade the

court only that its factual allegations constitute a prima facie
showing of jurisdiction."  Ball v. Metallurgie Hoboken-Overpelt,
S.A., 902 F.2d 194, 197 (2d Cir. 1990); see also id. at 197
(noting that a Rule 12(b)(2) motion "assumes the truth of the
plaintiff's factual allegations for purposes of the motion and
challenges their sufficiency").  "'[W]hen a motion to dismiss
for lack of jurisdiction is decided on the basis of affidavits
and other written materials . . . . [t]he allegations in the
complaint must be taken as true to the extent they are
uncontroverted by the defendant's affidavits.'"  Seetransport
Wiking Trader Schiffanhtsgesellschaft MBH & Co.,
Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572,
580 (2d Cir. 1993) (quoting Taylor v. Phelan, 912 F.2d 429, 431
(10th Cir. 1990) (per curiam)).  Thus, "'[i]f the parties
present conflicting affidavits, all factual disputes are
resolved in the plaintiff's favor, and the plaintiff's prima
facie showing is sufficient notwithstanding the contrary
presentation by the moving party.'"  Id.  Finally, "the
amenability of a foreign corporation to suit in a federal court
in a diversity action is determined in accordance with the law
of the state where the court sits," and thus Connecticut law is
applied.  Arrowsmith v. United Press Int'l, 320 F.2d 219, 223
(2d Cir. 1963).

**B.    Failure to State a Claim -- Federal Rule of Civil Procedure 12(b)(6)**

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted).

However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 568.  "The function of a motion to dismiss is 'merely to assess

the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims."  United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).  "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss.  A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'"  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

As discussed below, the court concludes that it has jurisdiction over the defendants, although in reality there are only two of them.  The court also concludes that although the plaintiff's claims are not barred by the First Amendment, the plaintiff has failed to state a claim with respect to Counts I, II, and III to the extent they are based on the Documentary and its promotional materials, and with respect to Counts I and II to the extent they are based on the Film and its promotional materials.

### A.    Personal Jurisdiction

A "federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."  Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007).

In Connecticut, "a trial court may exercise jurisdiction over a foreign defendant only if the defendant's intrastate activities meet the requirements both of [the state's long-arm] statute and of the due process clause of the federal constitution."  Thomason v. Chem. Bank, 234 Conn. 281, 285-86 (1995).  "[The] first inquiry must be whether our long-arm statute authorizes the exercise of jurisdiction under the particular facts of this case.  Only if we find the statute to

be applicable do we reach the question whether it would offend due process to assert jurisdiction." Lombard Bros., Inc. v. Gen. Asset Mgmt. Co., 190 Conn. 245, 250 (1983).

### 1.  Celine Cousteau

Celine Cousteau contends that even though she was personally served in Connecticut, the court lacks personal jurisdiction over her.  Although she concedes that exercising personal jurisdiction over her based on so-called transient jurisdiction would not offend due process, see Burnham v. Superior Court of Cal., 495 U.S. 604, 610-11 (1990), she argues that TCS still must show that the Connecticut long-arm statute permits that exercise of personal jurisdiction over her.

Courts in Connecticut have held that service on an individual who is physically present in the state is sufficient to exercise personal jurisdiction over her and have not looked to a provision of the long-arm statute to reach that conclusion. See, e.g., Anton/Bauer, Inc. v. Pag, Ltd., No. 3:01CV577(CFD), 2002 WL 31106373, at *1 (D. Conn. Sept. 10, 2002); Malpeso v. Malpeso, No. FSTFA010185205S, 2015 WL 1086692, at *3 (Conn. Super. Ct. Feb. 17, 2015); Citibank v. Cotton, No. CV92 0124559, 1992 WL 339766, at *1 (Conn. Super. Ct. Nov. 18, 1992); Weiss v. Friedman, No. CV 88 0094242 S, 1990 WL 284330, at *3 (Conn. Super. Ct. May 22, 1990).  Connecticut courts have long recognized this basis for personal jurisdiction, and there is no

evidence that the Connecticut Supreme Court would conclude otherwise.  See Renée Bevacqua Bollier et al., 1 Stephenson's Connecticut Civil Practice § 21 (3d ed. 1997) ("[T]here is no indication that Connecticut is prepared to modify the view that personal service within the state confers in personam jurisdiction over the defendant upon the court."); cf. Standard Tallow Corp. v. Jowdy, 190 Conn. 48, 53 (1983) ("When jurisdiction is based on personal or abode service, the matters stated in the return, if true, confer jurisdiction.").  The court finds unpersuasive Celine Cousteau's argument that personal service in Connecticut is insufficient.[2]

Therefore, the court concludes that it may exercise personal jurisdiction over Celine Cousteau, and the Rule 12(b)(2) motion is being denied as to her.

---

[2] Celine Cousteau cites A. v. Weiss, 121 F. Supp. 2d 718, 722 (D. Conn. 2000), for the proposition that a "claim of jurisdiction by service has no support in Connecticut's long-arm statute."  However, Weiss does not state that the individual defendant there was personally served while in Connecticut.  In fact, the court noted that the defendant's "only entries into Connecticut" were in 1998, at least 10 months before the suit was filed in 1999.  See id. at 720.  Moreover, immediately after the quoted passage, the court stated with respect to the claim of jurisdiction by service: "nor would it survive a constitutional due process analysis."  Id. at 722.  If the claim of personal jurisdiction was based on transient jurisdiction, then that conclusion would have been in conflict with the Supreme Court's decision Burnham.

## 2.    CauseCentric Productions, Inc.

The defendants argue that the court cannot exercise personal jurisdiction over CPI "because the entity no longer exists."  (Defs.' Mem. Supp. Mot. to Dismiss First Am. Compl. ("Defs.' Mem.") 11, ECF No. 25-1.)

However, the entity that was formerly named "CauseCentric Productions, Inc." still exists.  It has simply changed its name to "The Celine Cousteau Film Fellowship Inc.," which is CCFF.  (See Defs.' Notice of Filing, Ex. 1, at 1, ECF No. 75-1.)  Thus, it is a defendant in this case under its current name.  There is no need to name it as a defendant twice.  Therefore, "CauseCentric Productions, Inc." is dismissed as a defendant.

## 3.    The Celine Cousteau Film Fellowship Inc.

### a.    Long-arm Statute

Not-for-profit corporations may be subject to personal jurisdiction in Connecticut pursuant to Conn. Gen. Stat. § 33-1219.  See Conn. Gen. Stat. § 33-1002(15) (defining "foreign corporation" as "any nonprofit corporation with or without capital stock which is not organized under the laws of this state"); Nedgam Prods., LLC v. Bizparentz Found., No. 3:09-CV-500 CFD, 2010 WL 3257909, at *5 n.10 (D. Conn. Apr. 29, 2010).  Under subsection 33-1219(e), "[e]very foreign corporation which conducts affairs in this state in violation of section 33-1210 shall be subject to suit in this state upon any cause of action

-13-

arising out of such affairs." Conn. Gen. Stat. § 33-1219(e).

"The subsection thus confers local jurisdiction over a foreign

corporation on two conditions: the transaction of business in

this state, and a cause of action arising out of the transaction

of such business." Lombard Bros, 190 Conn. at 251 (interpreting

§ 33-929(e)'s predecessor, Conn. Gen. Stat. § 33-411(b)).[3]

Section 33-1210(a) provides that a foreign nonprofit

corporation "may not conduct affairs in this state until it

obtains a certificate of authority from the Secretary of the

State." Conn. Gen. Stat. § 33-1210(a). "It is well established

that 'the question of whether a foreign corporation is

transacting business so as to require a certificate of authority

must be determined on the complete factual picture presented in

each case, and that the corporation's activities must be more

substantial than those which would suffice to subject it to

service of process.'" Wagner & Wagner Auto Sales, Inc. v.

Tarro, 93 Conn. App. 376, 381 (2006) (quoting Sawyer Savings

Bank v. Am. Trading Co., 176 Conn. 185, 190 (1978)). "The term

transacting business is not broadly interpreted in Connecticut."

Goudis v. Am. Currency Trading Corp., 233 F. Supp. 2d 330, 334

(D. Conn. 2002) (quoting Chem. Trading, Inc. v. Manufacture de

---

[3] The "conducting affairs" language of section 33-1219(f) is
interpreted to have the same meaning as the "transacting
business" language of section 33-929(e)-(f). See Nedgam Prods.,
2010 WL 3257909, at *5 n.10.

Produits Chimiques de Tournan, 870 F. Supp. 21, 23 (D. Conn. 1994)).  Nevertheless, "a defendant may be held to have transacted business in the forum even though it is not licensed in Connecticut, nor maintains any office, real estate, bank account, telephone listing, representation or agent in the state."  Teleco Oilfield Servs., Inc. v. Skandia Ins. Co., 656 F. Supp. 753, 758 n.6 (D. Conn. 1987).

Subsection (b) provides a non-exhaustive list of activities which do not constitute conducting affairs within the meaning of subsection (a), including: "soliciting or obtaining orders, whether by mail or through employees or agents or otherwise, if the orders require acceptance outside this state before they become contracts," id. § 33-1210(b)(5); "conducting an isolated transaction that is completed within thirty days and that is not one in the course of repeated transactions of a like nature," id. § 33-1210(b)(9); and "conducting affairs in interstate commerce," id. § 33-1210(b)(10).

TCS argues that CCFF conducted affairs in Connecticut within the meaning of section 33-1210 by means of, inter alia, its internet activity, which includes CCFF's website publicizing CCFF's cause and the Film using Jacques-Yves Cousteau's name, likeness, and image.  That activity also includes the website created for the Film, which promoted the Film and encouraged visitors to join a mailing list, encouraged them to attend the

screening of the Film in Connecticut, and sought financing for the Film and CCFF's cause by providing a direct link to a donations page on CCFF's website.

Courts in this district have drawn a distinction between active and passive websites for purposes of the exercise of personal jurisdiction.  See Kun Shan Ge Rui Te Tool Co. v. Mayhew Steel Prods., Inc., 821 F. Supp. 2d 498, 503 (D. Conn. 2010); see also Best Van Lines, Inc. v. Walker, 490 F.3d 239, 251-52 (2d Cir. 2007) (explaining that a website's interactivity assists inquiry into whether a defendant has transacted business, under the New York long-arm statute, or purposefully availed himself of the privilege of doing business in a state, under the due process analysis).  Active websites are those "where individuals can directly interact with a company over their Internet site, download, transmit[,] or exchange information, and enter into contracts with the company via computer."  On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 265 (D. Conn. 2001).  Active websites may support an exercise of personal jurisdiction.  On the other end of the continuum, "[p]assive websites that require a potential customer to initiate contact with the foreign corporation by telephone, mail, or email, rather than allowing them to order directly over the Internet, cannot support personal jurisdiction."  Mayhew Steel Prods., 821 F. Supp. 2d at 503; see

also On-Line Techs., 141 F. Supp. 2d at 265 (discussing passive websites).  "The middle ground between the two extremes involves sites where parties can interact with the defendant company, but may not be able to contract with the company or make purchases over the Internet site; in such situations, most courts follow . . . Zippo Manufacturing Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)[,] and determine whether jurisdiction is proper by 'examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.'" On-Line Techs, 141 F. Supp. 2d at 265 (quoting Zippo Mfg., 952 F. Supp. at 1124).

CCFF contends that seeking financing for the Film on its website is insufficient to make the website anything more than passive, citing Mayhew Steel Products.  There the court concluded that the defendant's website, which "d[id] not permit online purchases, but instead invite[d] viewers to contact the company by telephone or fax, or to visit in person in Massachusetts," was insufficient to make it subject to personal jurisdiction in Connecticut.  821 F. Supp. 2d at 503.  The court reached that conclusion based, at least in part, on the exception under section 33-920(b) for soliciting orders that require acceptance outside Connecticut before they become contracts.  See id.

Here however, CCFF's website does not fall within the exception for "soliciting or obtaining orders . . . if the orders require acceptance outside this state before they become contracts."  Conn Gen. Stat. § 33-1210(b)(5).  CCFF's website solicits donations from its website and provides a direct link to the donations page on its website.  Unlike Mayhew Steel Products, where the website merely provided information and instructed visitors to contact the defendant outside Connecticut to complete the order, the transaction here (i.e., providing funding to CCFF and for the Film) could be conducted entirely through CCFF's website.  No additional steps were required by Connecticut residents to engage with CCFF outside Connecticut.  Thus, the court concludes that CCFF's website is not only more than passive but also makes it proper to exercise personal jurisdiction based on the level of interactivity and the commercial nature of the exchange on the website.

Under the second prong of section 33-1219(e), "[o]nce a plaintiff establishes that the defendant corporation meets this prerequisite [of transacting business in Connecticut without valid certificate], a plaintiff must establish that its cause[] of action arises out of the business that the foreign corporation conducted in Connecticut."  Woodbridge Structured Funding, LLC v. Structured Settlement Quotes, No. 3:14-cv-00214 (JAM), 2014 WL 6783160, at *4 (D. Conn. Dec. 2, 2014)

(alterations in original) (quoting <u>Wilson v. DirectBuy, Inc.</u>, 821 F. Supp. 2d 510, 521 (D. Conn. 2011)).  There is "no jurisdictional base in the absence of allegations that the plaintiff's cause[] of action arose out of the defendant's transaction of business in Connecticut."  <u>Lombard Bros.</u>, 190 Conn. at 253.  "A cause of action arises out of the transaction of business where the litigation 'bears some connection with the business conducted by the foreign corporation in this state.'"  <u>Wilson</u>, 821 F. Supp. 2d at 521 (quoting <u>Lombard Bros.</u>, 190 Conn. at 253).

TCS's six-count complaint alleges Lanham Act trademark and false association violations, violations of Connecticut's common-law trademark and unfair competition law, and violations of Jacques-Yves Cousteau's right of publicity under French or Connecticut law.  The allegations focus on CCFF's alleged use of and trading off TCS's marks, including on the websites on which CCFF sought donations and funding for itself and the Film.  TCS alleges that CCFF misappropriated these marks and violated Jacques-Yves Cousteau's right of publicity, trading off association with those marks, in order to generate interest in and funding for CCFF's causes and the Film.  Because the affairs which CCFF conducted in Connecticut include soliciting donations on and receiving them through its website on which it utilizes

TCS's marks to solicit such donations, this suit "bears some connection with" those affairs.

Therefore, the court concludes that section 33-1219(e) authorizes exercising personal jurisdiction over CCFF.

b. <u>Due Process</u>

"The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant." <u>Helicopteros Nacionales de Colom., S.A. v. Hall</u>, 466 U.S. 408, 413-14 (1984). "[R]estrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." <u>Bristol-Myers Squibb Co. v. Superior Court</u>, 137 S. Ct. 1773, 1780 (2017) (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 251 (1958)). "Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" <u>Helicopteros Nacionales de Colom.</u>, 466 U.S. at 414 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).

"Specific jurisdiction . . . depends on an affiliatio[n] between the forum and the underlying controversy, principally,

activity or an occurrence that takes place in the forum State
and is therefore subject to the State's regulation." Goodyear
Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)
(alteration in original) (internal quotation marks and citations
omitted).  "When a controversy is related to or 'arises out of'
a defendant's contacts with the forum, the Court has said that a
'relationship among the defendant, the forum, and the
litigation' is the essential foundation of in personam
jurisdiction." Helicopteros Nacionales de Colom., 466 U.S. at
414 (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

     "The Supreme Court has set out three conditions for the
exercise of specific jurisdiction over a nonresident defendant."
U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d
Cir. 2019).  "First, the defendant must have purposefully
availed itself of the privilege of conducting activities within
the forum State or have purposefully directed its conduct into
the forum State." Id. (quoting Bristol-Myers Squibb, 137 S. Ct.
at 1785 (Sotomayor, J., dissenting)).  "Second, the plaintiff's
claim must arise out of or relate to the defendant[s'] forum
conduct." Id. (quoting Bristol-Myers Squibb, 137 S. Ct. at 1786
(Sotomayor, J., dissenting)).  Third, "the exercise of
jurisdiction must be reasonable under the circumstances." Id.

(quoting <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1786 (Sotomayor,
J., dissenting)).[4]

i.   Minimum contacts

"A court deciding whether it has jurisdiction over an out-
of-state defendant under the Due Process Clause must evaluate
the 'quality and nature,' of the defendant's contacts with the
forum state under a totality of the circumstances test." <u>Best
Van Lines</u>, 490 F.3d at 242 (quoting <u>Burger King Corp. v.
Rudewicz</u>, 471 U.S. 462, 475 (1985)).  "[M]inimum contacts
necessary to support [specific personal] jurisdiction exist
where the defendant purposefully availed itself of the privilege
of doing business in the forum and could foresee being haled
into court there." <u>Charles Schwab Corp. v. Bank of Am. Corp.</u>,
883 F.3d 68, 82 (2d Cir. 2018).

Here, CCFF's contacts with Connecticut include: websites,
which allegedly employ marks owned by TCS, soliciting donations
to support CCFF's causes and fund the Film; websites, which
allegedly employ marks owned by TCS, which publicized the

---

[4] The defendants appear to concede the first two prongs of
the due process analysis but argue that "an exercise of personal
jurisdiction would be unreasonable where, as here, foreign
defendants with only minimal contacts with the forum are forced
to litigate in the forum based on the posting of allegedly
infringing material on the Internet and/or the screening of a
Film that is not alleged to contain any infringing material."
(Defs.' Reply Mem. in Supp. Mot. to Dismiss ("Defs.' Reply") at
5 n.6, ECF No. 57.)

screening of the Film in Connecticut and encouraged visitors to join a mailing list; and the promotional screening of the Film, which was advertised alongside TCS's marks and gratuitously uses Jacques-Yves Cousteau's image and likeness throughout, in Connecticut.

As discussed above, courts in this district use the sliding scale developed in Zippo Manufacturing to determine if a website constitutes purposeful availment of the privilege of conducting activities within Connecticut or purposefully directing conduct into Connecticut.  As also discussed above, the court has concluded that CCFF's websites, which solicited donations for CCFF's causes and funding for the Film directly on the websites, were more than merely passive websites.  With respect to the use of TCS's marks on the websites for informational purposes, although the websites were passive in that regard, they did target Connecticut residents as they encouraged individuals to attend the promotional screening of the Film in Connecticut. See ICG Am., Inc. v. Wine of the Month Club, Inc., No. 3:09-CV-133 (PCD), 2009 WL 2843261, at *6 (D. Conn. Aug. 28, 2009) ("Evidence that Connecticut residents accessed the defendant's site, that they purchased products from the website, or that the website targeted Connecticut residents is necessary to find purposeful availment."); Edberg v. Neogen Corp., 17 F. Supp. 2d 104, 114-15 (D. Conn. 1998) (noting that websites which

specifically target Connecticut residents may also further
support an exercise of personal jurisdiction here).

Evaluating the quality and nature of CCFF's contacts with
Connecticut under the totality of the circumstances, the court
concludes that TCS has adequately alleged that CCFF purposefully
availed itself of the privilege of conducting activities in
Connecticut, or purposefully directed its conduct into
Connecticut, and could reasonably foresee being haled into court
here.

### ii.  Arising out of Connecticut contacts

"In order for a state court to exercise specific
jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the
defendant's contacts with the forum.'"  Bristol-Myers Squibb,
137 S. Ct. at 1780 (alterations in original) (quoting Daimler AG
v. Bauman, 571 U.S. 117, 127 (2014)).  "In other words, there
must be 'an affiliation between the forum and the underlying
controversy, principally, [an] activity or an occurrence that
takes place in the forum State and is therefore subject to the
State's regulation.'"  Id. (alteration in original) (quoting
Goodyear Dunlop Tires Operations, 564 U.S. at 919).

As the court has already concluded with respect to the
analysis under the long-arm statute, CCFF's contacts in
Connecticut have an "affiliation" with the controversy here.
See Bristol-Meyers Squibb, 137 S. Ct. at 1780.  This suit brings

claims for federal trademark infringement, state-law common-law trademark infringement, and violation of Jacques-Yves Cousteau's right of publicity.  CCFF's contacts in Connecticut are all alleged to include misuse of TCS's marks or Jacques-Yves Cousteau's right of publicity in order to promote CCFF's activities.

### iii. Reasonableness

Even if minimum contacts exist, an exercise of personal jurisdiction may still be prohibited by the Due Process Clause if exercising personal jurisdiction would be unreasonable.  The reasonableness analysis asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'--that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case."  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010) (quoting Int'l Shoe, 326 U.S. at 316).  The Supreme Court has held that courts must evaluate the following factors as part of the reasonableness analysis:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

Id. at 164-65 (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-14 (1987)).

"If minimum contacts exist, the defendant has to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 169 (2d Cir. 2015) (quoting Licci v. Lebanese Canadian Bank, 732 F.3d 161, 173 (2d Cir. 2013)). CCFF fails to do so. It merely asserts that "an exercise of personal jurisdiction would be unreasonable where, as here, foreign defendants with only minimal contacts with the forum are forced to litigate in the forum based on the posting of allegedly infringing material on the Internet and/or the screening of a Film that is not alleged to contain any infringing material." (Defs.' Reply at 5 n.6.)

Moreover, the relevant factors do not suggest that the exercise of personal jurisdiction here would be unreasonable. CCFF has not identified what burden will be imposed upon it if it has to defend this action in Connecticut. Contra, e.g., WorldCare Corp. v. World Ins. Co., 767 F. Supp. 2d 341, 362 (D. Conn. 2011) (finding that litigation in Connecticut would be burdensome where defendant presented evidence that all its witnesses and documents were in Nebraska). Although TCS is not a Connecticut resident, Connecticut has an interest in adjudicating this case because it involves application of

Connecticut trademark and unfair competition law, and it is based on alleged actions that occurred in Connecticut or were directed at Connecticut residents.  See, e.g., Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 244 (2d Cir. 1999) (application of New York law to a case supports reasonableness of New York personal jurisdiction).[5]  With respect to the plaintiff's interest in obtaining effective relief, the plaintiff's choice of forum is "entitled to substantial consideration," In re Warrick, 70 F.3d 736, 741 (2d Cir. 1995), and that choice appears reasonable given that the Film was screened in Connecticut and that the alleged infringement of TCS's trademark and publicity rights was engaged in for purposes of promoting the Film.  The interstate judicial system's interest generally considers "where witnesses and evidence are likely to be located," Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 574 (2d Cir. 1996), but neither party explains where the witnesses and evidence are likely to be located.  Finally, with respect to the states' shared interest in furthering substantive social policies, the administration of Connecticut common-law trademark rights and right of publicity related to the

---

[5] Contra, e.g., WorldCare, 767 F. Supp. 2d at 362 (finding that Connecticut did not have a notable interest in the litigation because the matter concerned only federal trademark law and no matters of Connecticut law).

promotional screening in Connecticut favors litigating the case in Connecticut.

Thus, TCS has made a <u>prima facie</u> case that CCFF is subject to personal jurisdiction in Connecticut.

**B.   Failure to State a Claim**

**1.   First Amendment Protection for All Claims**

The defendants argue that all TCS's claims are precluded by the First Amendment and the right to free expression under <u>Rogers v. Grimaldi</u>, 875 F.2d 994 (2d Cir. 1989).  They argue that their uses of TSC's marks are protected uses and thus not subject to Lanham Act or state-law claims because "[t]he slight risk that such use of [Jacques-Yves Cousteau's] [likeness] might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression . . . ."  (Defs.' Mem. at 22 (third alteration in original) (quoting <u>Rogers</u>, 875 F.2d at 1000).)

Although "it is well established that where the title of a movie or a book has acquired secondary meaning . . . the holder of the rights to that title may prevent the use of the same or confusingly similar titles by other authors," <u>Rogers</u>, 875 F.2d at 998, the Lanham Act has been construed to "apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression," <u>id.</u> at 999.  Thus, "in deciding the reach of the Lanham Act in any

case where an expressive work is alleged to infringe a
trademark, it is appropriate to weigh the public interest in
free expression against the public interest in avoiding consumer
confusion." Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g
Grp., Inc., 886 F.2d 490, 494 (2d Cir. 1989).  "While Rogers was
focused on the title of an artistic work, the Second Circuit has
expanded its two-prong test to apply to artistic works more
broadly." Brown v. Showtime Networks, Inc., 394 F. Supp. 3d
418, 442 (S.D.N.Y. 2019) (citing Cliffs Notes, Inc., 886 F.2d at
495).

Rogers set out a two-pronged test to determine whether an
artistic work may be protected by First Amendment interests in
free expression.  First, if the allegedly infringing use "has no
artistic relevance to the underlying work whatsoever," then the
inquiry is complete as the artistic work is not entitled to
First Amendment protection.  Rogers, 875 F.2d at 999.  The
artistic-relevance threshold is "appropriately low."  Id.
Second, if the allegedly infringing use "has some artistic
relevance," it may still not merit First Amendment protection if
it "explicitly misleads as to the source or the content of the
work."  Id.  "This limiting construction would not apply to
misleading titles that are confusingly similar to other titles,"
because "[t]he public interest in sparing consumers this type of

confusion outweighs the slight public interest in permitting
authors to use such titles."  Id. at 999 n.5.

"This approach takes into account the ultimate test in
trademark law, namely, the likelihood of confusion 'as to the
source of the goods in question.'"  Cliffs Notes, 886 F.2d at
495 (quoting Universal City Studios, Inc. v. Nintendo Co., 746
F.2d 112, 115 (2d Cir. 1984)).  "This determination must be
made, in the first instance, by application of the venerable
Polaroid factors."  Twin Peaks Prods., Inc. v. Publications
Int'l, Ltd., 996 F.2d 1366, 1379 (2d Cir. 1993).  The eight
Polaroid factors are:

> (1) strength of the trademark; (2) similarity of the
> marks; (3) proximity of the products and their
> competitiveness with one another; (4) evidence that
> the senior user may "bridge the gap" by developing a
> product for sale in the market of the alleged
> infringer's product; (5) evidence of actual consumer
> confusion; (6) evidence that the imitative mark was
> adopted in bad faith; (7) respective quality of the
> products; and (8) sophistication of consumers in the
> relevant market.

Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97,
115 (2d Cir. 2009).  "In determining whether [the plaintiff] has
plausibly pled a likelihood of confusion as to its claimed trade
dress, 'no single factor is dispositive.'"  AJB Enters., LLC v.
Backjoy Orthotics, LLC, No. 3:16-CV-00758 (VAB), 2016 WL
7341702, at *7 (D. Conn. Dec. 18, 2016) (quoting Louis Vuitton
Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 118 (2d Cir.

2006)).  "[T]he finding of likelihood of confusion must be
particularly compelling to outweigh the First Amendment interest
recognized in <u>Rogers</u>."  <u>Twin Peaks Prods.</u>, 996 F.2d at 1379.

 "In the context of a motion to dismiss, courts have
disposed of trademark claims where simply looking at the work
itself, and the context in which it appears, demonstrates how
implausible it is that a viewer will be confused into believing
that the plaintiff endorsed the defendant's work."  <u>Roberts v.
Bliss</u>, 229 F. Supp. 3d 240, 251 (S.D.N.Y. 2017) (quoting <u>Louis
Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.</u>, 868
F. Supp. 2d 172, 183 (S.D.N.Y. 2012)).  But "[a]s a general
rule, 'the likelihood of confusion is a fact-intensive analysis
that ordinarily does not lend itself to a motion to dismiss.'"
<u>World Trade Ctrs. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.</u>, No.
15 CV 7411-LTS, 2016 WL 8292208, at *2 (S.D.N.Y. Dec. 15, 2016)
(quoting <u>Merck & Co., Inc. v. Mediplan Health Consulting, Inc.</u>,
425 F. Supp. 2d. 402, 412 (S.D.N.Y. 2006)).

 With respect to the first prong of the test under <u>Rogers</u>,
TCS argues that the defendants' uses of TCS's marks have no
artistic relevance.  However, its argument appears to be that
the uses have no artistic relevance because the defendants are
using the marks "to gain attention and notoriety in the
industry."  (Pl.'s Mem. Opp'n to Defs.' Mot. to Dismiss First
Am. Compl. for Lack of Personal Jurisdiction Or, Alternatively,

for Failure to State a Claim Upon Which Relief Can Be Granted at 26, ECF No. 52.)  But the threshold for artistic relevance is low, and here, the alleged infringements have artistic relevance to the underlying works, i.e., the Film and the Documentary. The title of the Documentary, The Adventure Continues, refers to the content of the Documentary, i.e., the travels of Celine Cousteau which are the subject of the Documentary.  Both the Documentary and the Film are based in the historical context of her grandfather Jacques-Yves Cousteau's past explorations.  The use of Jacques-Yves Cousteau's name, image, and likeness have artistic relevance because they explain a significant aspect of Celine Cousteau's personal story, which is presented as context for the Film and the Documentary.  Thus, the court concludes that the alleged infringements have some artistic relevance to the underlying work.

With respect to the second prong, TCS plausibly alleges a compelling case for likelihood of confusion.  TCS alleges facts showing that throughout numerous materials, products, and advertisements, the defendants gratuitously use Jacques Yves-Cousteau's name, image, likeness, and trademarked red cap, and they also discuss his work and "retrace [his] mythic explorations."  (FAC, Ex. K, at 2.)  Relevant here are the similarity in the missions of the defendants and Jacques-Yves Cousteau, the defendants' consistent use of Jacques-Yves

Cousteau's name, image, and likeness, and the prevalence of the emphasis on the familial relationship between Jacques-Yves Cousteau and Celine Cousteau.  Given those factors, the court cannot conclude at the motion to dismiss stage that TCS's claim that the allegedly infringing uses would likely confuse the consumer as to TCS's endorsement of or involvement in the defendants' activities is implausible.  This case is not one where simply looking at an underlying work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be misled into believing that the plaintiff endorsed the defendant's work.  See Roberts, 229 F. Supp. 3d at 251 (quoting Louis Vuitton Malletier S.A., 868 F. Supp. 2d at 183).

### 2.    Lanham Act Trademark and False Association Claims

Count I is a claim for infringement of TCS's registered trademarks under section 32 of the Lanham Act, 15 U.S.C. § 1114. Count II is a claim for infringement of TCS's unregistered trademark under section 43(a) of the Lanham Act, id. § 1125(a). Count III is a claim for false association in violation of section 43(a) of the Lanham Act, id.

The defendants argue that TCS has failed to adequately plead that they used or traded off TCS's marks in commerce. They also argue that these counts fail to plead use of TCS's marks or any likelihood of confusion.

"In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods or services,' (5), without the plaintiff's consent." 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)). "In addition, the plaintiff must show that defendant's use of that mark 'is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff].'" Id. at 407 (alterations in original) (quoting 15 U.S.C. § 1125(a)(1)(A)).

The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." Id. § 1127. The Lanham Act has been interpreted to grant "broad jurisdictional powers upon the courts of the United States." Steele v. Bulova Watch Co., 344 U.S. 280, 283 (1952). "The history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause." United We Stand Am., Inc. v. United We Stand,

Am. N.Y., Inc., 128 F.3d 86, 92 (2d Cir. 1997).  "In almost all cases, this means that the Lanham Act is limited to acts of infringement that affect interstate or foreign trade."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:53 (5th ed. 2020).

The internet has been "routinely recognized by [the Second Circuit] as an instrumentality of interstate commerce." United States v. Cheng Le, 902 F.3d 104, 112 (2d Cir. 2018).  Thus, any alleged use of or trading off TCS's marks over the internet constitutes use in commerce under the Lanham Act.  See, e.g., OBH, Inc. v. Spotlight Magazine, Inc., 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000) ("[T]he national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a 'use in commerce' for purposes of the Lanham Act."); Planned Parenthood Fed'n of Am., Inc. v. Bucci, No. 97 CIV. 0629 (KMW), 1997 WL 133313, at *3 (S.D.N.Y. Mar. 24, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998).[6]

_____

[6] 3 Jerome Gilson & Anne Gilson LaLonde, Gilson on Trademarks § 11.03 (2019) ("In the overwhelming majority of modern cases, the seldom-disputed question of whether the defendant's acts are 'in commerce' is resolved in the affirmative.  Most trademark owners . . . use or advertise their marks across state lines in the United States and more and more are advertising nationally (and internationally) on the Internet."); see also Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, (FAIR), 527 F.3d 1045, 1054 (10th Cir. 2008) ("We agree that the Internet is generally an instrumentality of interstate commerce and thus that the jurisdiction of the Lanham Act constitutionally extends to

a.   The Documentary and Related Materials

The defendants argue that TCS fails to allege "that the Documentary or the advertising materials in Exhibits K and L were distributed in the United States." (Defs.' Mem. 18.)  With respect to the advertising materials, TCS alleges, on information and belief, that "defendants are distributing a brochure and press kit[, i.e., Exhibits K and L,] for the Documentary to, inter alia, TCS' business partners."  (FAC ¶ 82.)  TCS also alleges that Celine Cousteau's use of the title Celine Cousteau: The Adventure Continues for the Documentary infringes on TCS's mark THE JOURNEY CONTINUES.  TCS further alleges that Celine Cousteau used images of Jacques-Yves Cousteau, the mark JACQUES-YVES COUSTEAU, and traded off Jacques-Yves Cousteau's legacy to market and promote the Documentary.  However, TCS does not allege any facts to support a conclusion that those activities related to the Documentary were done in the United States or targeted at the United States.  As to the promotional materials, although they are alleged to have been distributed to TCS's business partners, there are no factual allegations to support a conclusion that they were

_____

unauthorized uses of trademarks on the Internet." (citation omitted)).  But see Tenneco Auto. Operating Co. v. Kingdom Auto. Parts, 410 F. App'x 841, 855 (6th Cir. 2010) (concluding that use of a mark on a website which was clearly not directed to the United States did not satisfy the "in commerce" requirement).

distributed to TCS's business partners in commerce.  Moreover,
the screen capture of the promotional video in the FAC was
uploaded to YouTube by a French company, and there are no
allegations that the defendants control that company.  So, even
if the court could plausibly infer that the defendants
distributed the promotional video, the factual allegations still
do not suggest that the defendants distributed the promotional
video "in commerce" in the United States.  Thus, TCS has failed
to plead use in commerce, and the federal trademark claims,
Counts I, II, and III, must be dismissed to the extent they are
based on the Documentary and its promotional materials.

> b.   The Film and Related Materials

The defendants argue that there are no facts to support the
assertion that "the promotional or advertising materials posted
in connection with the Film, or the Film itself, used any of
TCS's trademarks as is required to state a claim for trademark
infringement or false designation of origin claim under
§ 43(a)."  (Defs.' Mem. 19 (emphasis in original).)  With
respect to the Film, TCS alleges that the defendants: (1)
"promote[] the Film on CPI's website by exploiting Jacques-Yves
Cousteau's name and likeness in various posts," (FAC ¶ 91); (2)
held a book giveaway of Jacques-Yves Cousteau's book, (id.
¶ 92); (3) posted on a website about the Film that it was
produced "[t]wenty-five years after joining my grandfather and

his Calypso crew on his expedition in the Amazon," (id. ¶ 93); (4) included the tag "jacques-yves cousteau" on a post on their website although "his name is not mentioned anywhere in the post," (id. ¶ 94); (5) used "images and pictures of Jacques Yves Cousteau . . . gratuitously . . . in the film and [exploited] his name," (id. ¶ 95); and (6) referenced Jacques-Yves Cousteau in the promotional teaser and superimposed a photo of Celine Cousteau in front of Jacques-Yves Cousteau's ship, (id. ¶ 96).

None of these facts supports a conclusion that the defendants used one of TCS's registered trademarks in the Film or in promoting the Film.  Therefore, Count I must be dismissed to the extent it is based on the Film and its related promotional materials.  Moreover, the only unregistered trademark which TCS has alleged is "the image of Jacques-Yves Cousteau's red cap."  (FAC ¶ 47.)  However, TCS has not alleged that the Film or its related materials used the image of Jacques-Yves Cousteau's red cap.  Thus, Count II must also be dismissed to the extent it is based on the Film and its promotional materials.

As to Count III, "the Lanham Act protects not only actual trademarks but also 'economic interests analogous to those protected by trademark law.'"  Rubio v. Barnes & Noble, Inc., No. 14-CV-6561 JSR, 2014 WL 6769150, at *3 (S.D.N.Y. Nov. 12, 2014) (quoting Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 625

(S.D.N.Y. 1985)).  "For example, a celebrity can assert a claim for false association to protect his or her 'commercial investment in the drawing power of his or her name and face in endorsing products and in marketing a career.'"  Id. (quoting Allen, 610 F. Supp. at 625).  "Although the Lanham Act's protections are not limited to widely known celebrities, a plaintiff has standing under the statute only if his or her identity carries some 'level of consumer recognition.'"  Id. (quoting Bondar v. LASplash Cosmetics, 12 Civ. 1417, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012)).  Here, TCS has plausibly alleged that Jacques-Yves Cousteau has a level of consumer recognition sufficient to support a Section 43(a) claim.  Thus, the motion to dismiss is being denied with respect to Count III to the extent that it brings a claim for false association concerning the Film and its related promotional materials.

### c.   Other Infringing Activities

TCS also alleges that the defendants have violated the Lanham Act by using "TCS'[s] Marks and Intellectual Property in commerce to advertise, market, and promote, CPI and/or CCF[F.]" (FAC ¶ 112; see also id. ¶ 124; id. ¶ 136.)  TCS alleges that Celine Cousteau posted on CCFF's website that she was "excited to announce, on [her] grandfather's birthday (he would have been 105 years old)" that she was creating CCFF, thereby "invoking

the JACQUES-YVES COUSTEAU Mark and his likeness to attract donors and funding to her organization."  (Id. ¶ 100.)  TCS also alleges that "[o]n CCF[F]'s website, Celine Cousteau used to purposefully provide a picture of what appear to be 'fellows' and 'mentors' in Jacques-Yves Cousteau's trademarked red cap." (Id. ¶ 101.)  It alleges further that in one post on CPI's website, Celine Cousteau writes about her grandfather as the "great inspiration for me personally as I set out to launch my own organization . . . " with a photograph of Jacques-Yves Cousteau hugging a young Celine Cousteau.  (Id. ¶ 102.)

The defendants do not make any arguments specific to these claims.  They simply argue that the FAC should be dismissed in its entirety.  To the extent that the defendants argue that their alleged use was not "in commerce," the alleged infringements are over the internet--an instrumentality of interstate commerce-- and thus constitute use "in commerce." Therefore, the motion to dismiss is being denied with respect to the claims based on these allegations.

### d.   Personal Involvement of Celine Cousteau

Celine Cousteau argues that there are no factual allegations that she, as opposed to the corporate entity, uploaded or distributed any of the materials at issue.  Although it is true that actions of a corporation cannot be simply imputed to an officer or director of the corporation absent

allegations to support an alter-ego or veil-piercing theory, TCS alleges, on information and belief, that Celine Cousteau personally performed many of the acts, which would constitute a violation by her of the Lanham Act.  (See, e.g., FAC ¶ 91 ("Celine Cousteau promotes the Film . . ."); id. ¶ 92 (". . . she promotes the Film on CPI's website . . ."); id. at ¶ 100 (". . . on CCF's website, Celine writes . . ."); id. ¶ 101 ("On CCF's website, Celine Cousteau used to purposefully provide . . ."); id. ¶ 102 ("In one post she specifically writes . . .").)  Thus, taking the factual allegations in the FAC as true, TCS has plausibly alleged Celine Cousteau's personal involvement.

### 3.  Connecticut Common-law Trademark Infringement and Unfair Competition Claim

The defendants argue that the claim for common-law trademark infringement and unfair competition under Connecticut law (Count IV) must be dismissed because TCS does not allege that any of the infringing activity occurred in Connecticut. Citing to Country Floors Inc. v. Mizak, No. 3:91-CV-628 JAC, 1993 WL 566217 (D. Conn. June 16, 1993), they argue that "[i]t is axiomatic that there must be infringing or otherwise violative use in this state in order to state a viable claim." (Defs.' Mem. 19.)  However, Country Floors merely states: "The plaintiff argues that the same facts which would support a

finding of liability under Sections 32 and 43 of the Lanham Act also support a finding of trademark infringement and unfair competition under Connecticut common law.  This view is consistent with decisions in this district."  1993 WL 566217, at *6; see also Verilux, Inc. v. Hahn, No. 3:05CV254(PCD), 2007 WL 2318819, at *10 (D. Conn. Aug. 10, 2007) ("The test for trademark infringement and unfair competition under Connecticut law is identical to the test under the Lanham Act."); Tyr Sport, Inc. v. Tyr Nat. Spring Water, Inc., No. 3:12-cv-761(SRU), 2013 WL 2455925, at *3 (D. Conn. 2013) (same).  The court is not aware of a case addressing the specific issue of whether infringing or violative conduct in Connecticut is an element of such a cause of action, and there is "a paucity of Connecticut case law on this cause of action."  Mashantucket Pequot Tribe v. Redican, 403 F. Supp. 2d 184, 191 (D. Conn. 2005).

In any event, assuming arguendo that infringing or violative conduct in Connecticut is an element, TCS has adequately alleged such activity in this state.  As discussed above with respect to the federal-law claims, TCS has alleged instances of infringing or violative conduct with respect to the Film, which was screened in Connecticut.  It has also alleged instances of infringing or violative conduct with respect to the defendants' websites, which were directed to and reached out to

Connecticut residents to advertise the Film and its screening in
Connecticut, as well as to solicit donations for the defendants.

### 4. Right of Publicity Claims

#### a. Choice of law

"A federal court . . . adjudicating state law claims that
are pendent to a federal claim must apply the choice of law
rules of the forum state." Rogers, 875 F.2d at 1002.
Connecticut has adopted the Restatement (Second) of Conflict of
Laws' "most significant relationship" test to determine the law
applicable to tort claims. See W. Dermatology Consultants, P.C.
v. VitalWorks, Inc., 322 Conn. 541, 551 n.9 (2016). Under this
test, a court must apply the substantive law of the state with
the "most significant relationship to the occurrence and the
parties under the principles stated in § 6." Id. (quoting
Restatement (Second) of Conflict of Laws § 145). Section 6
provides:

> the factors relevant to the choice of the applicable
> rule of law include: (a) the needs of the interstate
> and international systems, (b) the relevant policies
> of the forum, (c) the relevant policies of other
> interested states and the relative interests of those
> states in the determination of the particular
> issue,(d) the protection of justified expectations,
> (e) the basic policies underlying the particular field
> of law,(f) certainty, predictability and uniformity of
> result, and, (g) ease in the determination and
> application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).  The
contacts to be considered when applying the § 6 principles
include:

> (a) the place where the injury occurred, (b) the place
> where the conduct causing the injury occurred, (c) the
> domicil, residence, nationality, place of
> incorporation and place of business of the parties,
> and (d) the place where the relationship, if any,
> between the parties is centered.  These contacts are
> to be evaluated according to their relative importance
> with respect to the particular issue.

Id. § 145(2).

Under the most significant relationship test, the
Restatement (Second) of Conflict of Laws states that the
appropriate law for a claim for violation of an individual's
right of publicity will be "the state which, with respect to the
particular issue, has the most significant relationship to the
occurrence and the parties," which "will usually be the state
where the plaintiff was domiciled at the time if the matter
complained of was published in that state."  Id. § 153.  "A
state which is not the state of the plaintiff's domicil may be
that of most significant relationship if it is the state where
the invasion of the plaintiff's right of privacy caused him the
greatest injury."  Id. § 153, cmt. d.

The parties agree that the law of France applies to this
claim, as Jacques-Yves Cousteau was domiciled in France at the
time of his death.  Applying the § 145 factors, the court agrees

that applying French law is appropriate here.  Although the
alleged injuries to TCS and injurious conduct by the defendants
occurred in Connecticut, those injuries and conduct are spread
across the United States and even internationally given the
alleged infringing acts on the internet.  So on balance the
location of Jacques-Yves Cousteau's domicile at the time of his
death has the most significant relationship to these claims.  No
other § 6 or § 145 factor or combination of factors outweighs
this factor.  See, e.g., Zoll v. Jordache Enters., Inc., No. 01
CIV 1339 CSH JCF, 2001 WL 1550943, at *2 (S.D.N.Y. Dec. 5, 2001)
(noting that under the most significant relationship test
"California law will presumably apply to the right of publicity
claim because the plaintiff is a California domiciliary").

   b. Right of publicity claim under French law

  The defendants argue that Count V, which is a claim for
violation of Jacques-Yves Cousteau's right of publicity under
French law, should be dismissed for two reasons.

   i. Doctrine of forum non conveniens

  First, the defendants argue that the claim should be
severed and dismissed without prejudice under the doctrine of
forum non conveniens because TCS "seeks to bring claims under
another country's laws, and there is nothing to prevent TCS from
simply bringing its claim in a French tribunal."  (Defs.' Mem.
26.)  But "[a] defendant invoking forum non conveniens

ordinarily bears a heavy burden in opposing the plaintiff's chosen forum." Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430 (2007). "Any review of a forum non conveniens motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 154 (2d Cir. 2005) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981)). "[I]t is generally understood that, 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). Also, "it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens." R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 169 (2d Cir. 1991). Therefore, the defendants have failed to meet their burden of showing that this claim should be dismissed under the doctrine of forum non conveniens.

> ii.  Post-mortem right of publicity

Second, the defendants argue that TCS's claim fails because France does not recognize a post-mortem right of publicity. The defendants and TCS have submitted affidavits from French lawyers supporting their respective positions. Those lawyers disagree

about whether a post-mortem right of publicity is recognized under French law.[7]

TCS has submitted declarations of French lawyer Esther Hagège, who states that under French law, there are two aspects to a person's "right to her image."  (Decl. of Esther Hagège Supp. Pl.'s Opp'n Defs.' Mot. to Dismiss ¶ 4, ECF No. 52-2.) "The first aspect pertains to a person's private life and image, which is protected against undesired intrusions.  This aspect is very similar to privacy laws in the United States.  This right is usually qualified as an extra patrimonial right and cannot be inherited by the estate."  (Id.)  "The second aspect is the right to a person's image, when such image has commercial value. This aspect of the law is almost the same as the right of publicity laws in the U.S.  This right is a patrimonial right and can be inherited by the estate."  (Id.)

The defendants have submitted declarations of French lawyer Christine Nguyen Duc Long.  Nguyen states that the right to

---

[7] In determining an issue of foreign law, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  "In the absence of an authoritative answer to a foreign legal question . . . , a district court's obligation to reach an independent determination remains."  Bugliotti v. Republic of Arg., 952 F.3d 410, 414 (2d Cir. 2020).  The court "may do its own research on foreign law, just as it customarily always has done on issues of domestic law."  9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444 (3d ed. 1998).

one's image terminates upon death.  She relies on a January 2018 decision from the Court of Cassation, France's court of last resort for civil and criminal matters, which states that the lower court's decision "accurately found that an image right, attributed to a person, is extinguished upon the death of its proprietor" and "may not be transmitted to his heirs."  (Decl. of Christine Nguyen Duc Long Supp. Defs.' Mot. to Dismiss ("Nguyen Decl. I") ¶ 6, ECF No. 57-1 (quoting Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Jan. 31, 2018, 16-23.591).)  Nguyen also states that "the French jurisdictions don't recognize two aspects of a person's right to her image."  (Supp. Decl. of Christine Nguyen Duc Long Supp. Defs.' Mot. Dismiss & Response Pl.'s Sur-Reply ("Nguyen Decl. II") ¶ 3, ECF No. 63-1.)

"[V]arious legal scholars and commentators have emphasized the ambiguous nature of the right of image by describing it as embodying two concepts."  Elisabeth Logeais & Jean-Baptiste Schroeder, The French Right of Image: An Ambiguous Concept Protecting the Human Persona, 18 Loy. L.A. Ent. L.J. 511, 517 (1998).

> On the one hand, the right to protect one's image from
> unwanted exposure embodies a privacy interest.  This
> aspect flows from the general difficulty in placing a
> specific value on one's personal rights, while also
> recognizing the general consensus that one cannot
> alienate a personal attribute--the extrapatrimonial
> nature of the right.  This concept has been called the

>right <u>to</u> the image ["le droit à l'image"], meaning
>that an individual has an exclusive right to his or
>her own image such that he or she can oppose its
>unauthorized use and dissemination.  On the other
>hand, the right also embodies the desire to protect a
>marketable asset--the image of a popular person for
>which others are willing to offer compensation to use
>it.  The relatively recent recognition of this
>patrimonial nature has been characterized as the right
><u>on</u> the image ["le droit sur l'image"] (or the right to
><u>profit on</u> the image)--the patrimonial nature.

<u>Id.</u> (footnotes omitted) (emphases in original); <u>see also</u>

Kateryna Moskalenko, <u>The right of publicity in the USA, the EU,</u>

<u>and Ukraine</u>, 1 Int'l Comp. Juris. 113, 116 (2015); <u>see generally</u>

Grégoire Loiseau, <u>Des droits patrimoniaux de la personnalité en</u>

<u>droit français [Patrimonial Personality Rights Under French</u>

<u>Law]</u>, 42 McGill L.J. 319 (1997) (recognizing the growing

distinction).  In 1988, a French court explained the right to

profit on one's image as follows:

>The right to one's image has a moral and patrimonial
>character; the patrimonial right which allows the
>contracting of the commercial exploitation of the
>image for monetary compensation, is not purely
>personal and passes on to heirs. . . .  In the present
>case, the use of an actor's image for advertising
>purpose is not offensive; yet it was subject to his
>heirs' authorization for she could have derived profit
>from such use according to the law of demand on the
>advertising market.

Logeais & Schroeder, <u>supra</u>, at 537 (quoting Tribunaux de grande

instance [TGI] [ordinary courts of original jurisdiction] Aix en

Provence, Nov. 24, 1988, JCP éd. G. 1989, II, 21329).

Although the right to protect one's image terminates on the death of the person and cannot be transmitted to heirs, <u>see</u> Logeais & Schroeder, <u>supra</u>, at 535, the right to protect the one's image as a marketable asset that can be transferred and survive after death has gained recognition, <u>see</u> <u>id.</u> at 537-40. Nonetheless, one scholar has noted that the "descendibility of the right is not so clear." Moskalenko, <u>supra</u>, at 116.

In 2015, the Court of Cassation decided a case in which two organizations argued that they had an exclusive right on the image and name of the late singer and performer Michael Jackson. <u>See</u> Cour de cassation [Cass.] [supreme court for judicial matters], 1e civ., Feb. 4, 2015, 14-11458. The organizations argued on appeal that the right on the image and its commercial exploitation was patrimonial and transferable <u>inter</u> <u>vivos</u> and <u>causa</u> <u>mortis</u>. The Court of Cassation rejected the ground of error, but its reasoning was that the court of appeal did not err in concluding that the organizations did not have an exclusive right in France because the organizations did not produce evidence to support the conclusion that Michael Jackson would have intended to grant to them the exclusive right on his image in France. Thus, the decision did not reject the premise that the organizations would have had a valid right on the image had they presented evidence that Michael Jackson had intended to transfer the right to them.

Nguyen does reject that premise, and she cites to recent cases of the Court of Cassation, which she states make clear that the most recent rule is that there is no separate right on the image in a commercial sense, and that even if there is, it is clearly not transferable or descendible.  In a 2018 case, the widow of a songwriter and singer sought compensation from a company which marketed compact discs with photos of the artist without the widow's consent.  She challenged the lower court's ruling, arguing that "the exclusive right to exploit the image of an individual and derive a monetary profit, having a property value that is both appropriable and transferable, constitutes property that, absent a provision to the contrary, may be transmitted <u>inter</u> <u>vivos</u> and <u>causa</u> <u>mortis</u>."  (Nguyen Decl. I, Ex. B, at 2 (quoting Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Jan. 31, 2018, 16-23.591).)  The Court of Cassation rejected that argument on the ground that the lower court's "decision accurately found that an image right, attributed to a person, is extinguished upon the death of its proprietor and is not transferable to his heirs."  (<u>Id.</u> (quoting Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Jan. 31, 2018, 16-23.591).)  However, as Hagège points out, there was no suggestion in that case that the right on the image was transferred to the widow prior to death.

Nguyen asserts without reservation that "the French jurisdictions don't recognize two aspects of a person's right to her image."  (Nguyen Decl. II at ¶ 3.)  The court finds Hagège's declarations more persuasive in light of the scholarship that documents the increased recognition of the two aspects of the right of publicity under French law.

Moreover, the court finds Nguyen's arguments unpersuasive given the fact that Court of Cassation cases seem to suggest that the right on the image ("le droit sur l'image"), see Cour de cassation [Cass.] [supreme court for judicial matters], 1e civ., Feb. 4, 2015, 14-11458, if transferred prior to death, survives the death of the person with whom the right originated. Although Nguyen states that the Court of Cassation's decision in 2018 is "unequivocal" with respect to whether the right on the image is transmissible, there was no suggestion in that case that the right had been transferred by the decedent prior to death.  Moreover, the Court of Cassation characterized the widow's claim as one to the extra-patrimonial right to the image ("le droit à l'image") as opposed to the patrimonial right on the image ("le droit sur l'image").  Compare Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Jan. 31, 2018, 16-23.591, with Cour de cassation [Cass.] [supreme court for judicial matters], 1e civ., Feb. 4, 2015, 14-11458; and Logeais & Schroeder, supra, at 517 (explaining the distinction

in the language).  This court is not persuaded that the Court of Cassation eliminated the distinction between the two aspects of the image rights under French law in such a subtle manner.

Thus, the court concludes that, because Jacques-Yves Cousteau transferred the right on his image before his death to TCS, the right on his image survived his death and remains enforceable by TCS under the laws of France.

c.   Connecticut right of publicity claim

Count VI pleads in the alternative violation of Jacques-Yves Cousteau's right of publicity under Connecticut law.  It will be dismissed without prejudice because the court has concluded that the law of France applies here.

## IV.   CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, for Failure to State a Claim Upon Which Relief Can Be Granted (ECF No. 25) is hereby GRANTED in part and DENIED in part.  The motion is granted as to Counts I, II, and III (the Lanham Act claims) to the extent they are based on the Documentary and its promotional materials; Counts I and II (the Lanham Act claims for registered and unregistered trademark infringement) to the extent they are based on the Film and its related promotional materials; and Count VI (the Connecticut right of publicity claim).  The motion is denied in all other respects.

It is so ordered.

Dated this 8th day of October 2020, at Hartford,

Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
